UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| EARNEST J. NETTER, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) CASE NO. 3:07-CV-066 WCL |
| | ) |
| FRANK CANARECCI, et al | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment filed on March 31, 2008. Plaintiff, Earnest J. Netter ("Netter") filed his *pro se* response on May 29, 2008 to which Defendants replied on June17, 2008. For the following reasons, the Defendants' Motion will be GRANTED.

## FACTUAL BACKGROUND

Netter is a black male and has been incarcerated in the St. Joseph County Jail numerous times between the years 2004 and 2007. Defendant Frank Canarecci ("Canarecci") was the Sheriff of St. Joseph County, Indiana at all times relevant to this litigation. (Canarecci Aff, ¶ 4). Defendant Julie Lawson ("Lawson") was the Warden of the St. Joseph County Jail at all times relevant to this litigation. (Lawson Aff. ¶ 5). Defendant Belinda Schroeder ("Sgt. Schroeder") is a Sergeant and was the Classification Supervisor of the St. Joseph County Jail at all times relevant to this litigation. (Schroeder Aff. ¶ 5).

Given his repeat visits to the St. Joseph County Jail ("the Jail")over the years, Netter has a long list of individuals inside the jail with whom he has personal conflicts. The list of conflicts dates

1

from 2004 through 2007.[1] The present lawsuit arises from Netter's return to the Jail on November 29, 2006 and the events that took place subsequent to his arrival.

a.      **Overview of the Jail and its Inmate Classification System**

The Jail is a new facility opened in 2000 with a rated capacity of 680 inmates and currently operated at near capacity. (Schroeder, Aff. ¶30 -35; Lawson, Aff. ¶19- 34). The Jail consists of circular pods that are cut into slices for purposes of inmate management. If an inmate is in general population those individuals have day room privileges while housed in individual cells. If an inmate is housed in "Disciplinary Segregation" he has very limited access to the day room and the amenities found there. If an inmate is housed in "Administrative Segregation," access to the day room also remains more restrictive than that granted to the general population as a matter of necessity arising out of space available. "Administrative Segregation" is utilized to protect individuals who have individual needs unrelated to discipline that require separate housing. The Jail does not have the type of "Protective Custody" where the inmates have full access to the day room. The jail has "Administrative Protective Custody" due to the lack of space.

The Jail houses approximately six hundred fifty (650) inmates each day. (Lawson Aff. ¶ 6; Schroeder Aff. ¶ 26). On most days approximately one-half (½) of the St. Joseph County Jail population is comprised of black male inmates daily. (Lawson Aff. ¶ 16; Schroeder Aff. ¶ 27). While the Plaintiff was in the St. Joseph County Jail in November, 2006, the average daily total male inmate population was six hundred twenty-two (622) and the average daily black male inmate

---

[1] According to Netter, this list of individuals with whom he has had conflict is the direct result of an event that occurred on May 21, 2004. On that date, St. Joseph County Police Deputy Lucy Brown in the course of performing her duties of transporting prisoners in a holding cell commented to Netter that he was a "snitch." See Pltf. Exh. 2 in response to summary judgment. Deputy Brown received a "staff deficiency notice" for this conduct. Netter contends that his fights with other inmates in 2006 occurred, in large part, because of Deputy Brown's comments in 2004.

population was three hundred seventy-three (373). (Lawson Aff. ¶ 17; Schroeder Aff. ¶ 28). During December, 2006, while the Plaintiff was in the St. Joseph County Jail, the average daily total male inmate population was six hundred one (601) and the average daily black male inmate population was three hundred sixty (360). (Lawson Aff. ¶ 18; Schroeder Aff. ¶ 29). In January, 2007, while Netter was in the St. Joseph County Jail, the average daily total male inmate population was six hundred ten (610) and the average daily black male inmate population was three hundred forty-nine (349). (Lawson Aff. ¶ 19; Schroeder Aff. ¶ 30). In February, 2007, while Netter was in the St. Joseph County Jail, the average daily total male inmate population was five hundred eighty-five (585) and the average daily black male inmate population was three hundred nineteen (319). (Lawson Aff.¶ 20; Schroeder Aff. ¶ 31). During March, 2007, while the Plaintiff was in the St. Joseph County Jail, the average daily total male inmate population was five hundred sixty-two (562) and the average daily black male inmate population was three hundred thirteen (313). (Lawson Aff. ¶ 21; Schroeder Aff.¶ 32). Netter alleges that throughout his confinement, he was confined only in all black cell units.

Inmate custody classification level determinations and cell assignments at the St. Joseph County Jail are made by Sgt. Schroeder, or her staff with her approval, based upon objective criteria. (Lawson Aff. ¶ 22, 23; Schroeder Aff. ¶ 33, 34). The criteria are cell space availability and whether the inmate: (1) is currently being held for an assaultive felony offense; (2) has prior assaultive felony convictions; (3) has a history of escaping or trying to escape from jail; (4) is known to have past and/or present institutional behavioral problems; (5) has three or more felony convictions; (6) has detainers, holds, warrants or pending A or B felony charges; (7) has been sentenced; (8) has committed a felony; (9) has "family ties" to the local area; (10) was employed at the time of arrest;

3

(11) needs medical care; (12) is believed to be suicidal; (13) has conflicts with other inmates; and, (14) requires disciplinary segregation. (Lawson Aff. ¶ 23; Schroeder Aff. ¶ 34). There are eight (8) levels of custody classification in the St. Joseph County Jail. For example, Level 1 consists of inmates who pose the greatest threat to other inmates and jail staff and are being held for a current assaultive felony, have prior assaultive felony convictions and are known to have past or present institutional behavioral problems. Level 8 consists of inmates who pose the least threat to other inmates and jail staff and are being held for a current misdemeanor offense and do not have prior assaultive felony convictions, do not have a history of escaping or trying to escape from jail, do not have three (3) or more felony convictions, do not have detainers, holds, warrants or pending A or B felony charges, do not have known past or present institutional behavioral problems, have "family ties" to the local area and were employed at the time of arrest. These criteria are designed and employed to promote the safety of the inmates and the jail staff. (Lawson Aff. ¶ 22; Schroeder ¶ 33).

Defendants averred that all Netter's custody classifications and cell assignments were based upon the foregoing objective criteria. Race is not and has never been one of the criterions by which custody classifications and cell assignments have been made during the tenures of Sheriff Canarecci, Warden Lawson and Sgt Schroeder at the St. Joseph County Jail. (Canarecci Aff. ¶ 17; Lawson Aff. 25, 29; Schroeder Aff. ¶ 35, 38, 39, 40).

**b.** **Netter's Classification at the Jail and Subsequent Events**

On November 29, 2006, Netter was arrested and brought to the Jail and placed in the pre-classification cell. (Schroeder Aff. ¶ 9). All persons arrested and brought to the Jail are placed in pre-classification cells which are not segregated by race. (Schroeder Aff. ¶ 9). Netter was then classified and placed in Maximum Security Custody based upon the objective classification criteria as well

4

as the Cell Conflict Listing. (Schroeder, Aff. ¶ 9, 10).

On December 11, 2006, Plaintiff requested that he be placed in general population and, pursuant to this request, he was reclassified to "high medium security" and given an opportunity in general population. (Schroder, Aff. ¶ 11, 12). There were no further requests until January 16, 2007 following two events on January 13 and January 15, 2007.

On January 13, 2007, Netter was involved in a fight with another inmate, Kevin Martin. Immediately following the incident Netter was moved to another area of the jail to avoid further conflict. As a result of the January 13, 2007, fighting incident, inmate disciplinary charges were filed, an investigation conducted, and a hearing was held before the Conduct Adjustment Board. Netter was found guilty of "Battery With a Weapon" and "Conduct Which Disrupts." According to the Defendants, there was no prior indication of a pending altercation between Netter and Martin and it was immediately ended by the jail staff.

On January 15, 2007, only two days after the first incident, Netter was involved in another assault; however, on this occasion the investigation identified another inmate as the aggressor. Netter suffered cuts to his face and was immediately transported to the nurse's station and later to the emergency room at Memorial Hospital. As a result of the January 15, 2007 incident, inmate disciplinary charges were filed, an investigation conducted, and a hearing was held before the Conduct Adjustment Board. Netter was found not guilty of any offense.

The day after this second incident, Netter requested protective custody and on January 17, 2007 it was granted. Netter was placed in "Administrative Protective Custody." Following that reclassification, on January 26, 2007, the Conduct Adjustment Board ("the Board") handed down its Findings on both the January 13 and January 15 incidents. The Board found Netter guilty of

Battery With a Weapon Class I and Conduct Which Disrupts Class III and ordered him confined in disciplinary segregation until on or about February 15, 2007. (Lawson, Aff. ¶ 10). The Board found Netter not guilty of any charges resulting from the January 15, 2007 incident.

On February 14, 2007, a Resident Classification Review was conducted and Netter continued to be housed in the maximum custody cell block due to his behavior. (Schroeder, Aff. ¶ 14). On February 15, 2007 and February 18, 2007, Netter filed Inmate Grievances regarding his custody status. (Schroeder, Aff. ¶ 15). On February 20, 2007, Netter's Classification was reviewed and he was reclassified based upon his request to no longer be in protective custody. (Schroeder, Aff. ¶ 16). Netter then appealed his Classification status on February 21, 2007. (Schroeder, Aff. ¶ 17). Netter filed two (2) Inmate Request Slips regarding his classification status on February 21, 2007. (Schroeder, Aff. ¶ 18). At Sgt. Schroeder's request, on February 21, 2007, Deputy R. Scott spoke with Netter regarding whether he wanted to be in administrative protective custody and Netter stated "no." (Schroeder, Aff. ¶ 19). On February 22, 2007, Netter filed an Inmate Request and an Inmate Grievance regarding his classification. (Schroeder, Aff. ¶ 20). Netter filed an Inmate Grievance regarding his classification status on February 26, 2007. (Schroeder, Aff. ¶ 21). On March 1, 2007, Sgt. Schroeder sent a memo to Captain Huffine regarding Netter's classification as well as stating that classification is not based upon race in the St. Joseph County Jail. (Schroeder, Aff. ¶ 22). Netter signed a document stating he no longer wanted to be placed under protective custody on March 8, 2007. (Schroeder, Aff. ¶ 23). On March 8, 2007, Plaintiff was reclassified per his request to no longer be in protective custody and Netter was placed in general population. (Schroeder, Aff. ¶24.) Netter stayed in general population until he was transferred to the Indiana Department of Corrections later in 2007.

**DISCUSSION**

Based upon the above facts, Netter brought suit through 42 U.S.C. §1983 alleging Fourteenth Amendment violations against the Defendants in both their individual and official capacities claiming that he was subjected to a racially segregated inmate housing system. In addition, Netter asserts claims against Sgt. Schroeder and Warden Lawson for deliberate indifference to his safety while housed at the Jail.

**1.      Claims of Racially Segregated Classifications**

Turning first to Netter's contention that he was unconstitutionally subjected to a racially segregated prison assignment system, it is clear that this claim has no merit. The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr*. 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To bring a successful claim under 42 U.S.C. §1983 for a denial of equal protection, Netter must show that: 1) defendants intentionally discriminated on the basis of race in making cell assignments; 2) plaintiff suffered a legally cognizable injury; and 3) defendants were personally involved in the alleged violation. Racial classifications imposed by the government must be analyzed under a strict scrutiny standard. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227 (1995). Under this standard, government officials have the burden of proving that racial classifications "are narrowly tailored measures that further compelling government interests." *Id.* at 227. Prison or jail officials who racially segregate prisoners must justify their actions under the strict scrutiny standard. *Johnson v. California*, 543 U.S. 449 (2005).

The Defendants have submitted numerous affidavits, documents and exhibits wherein they deny intentionally segregating inmates by race and deny that there was a policy or practice of

segregating prisoners by race at the Jail. In addition, there is ample evidence that the Jail officials take into account a number of factors when determining housing assignments for inmates – including, the seriousness of the charges against them, history of attempted escape or assaultive behavior, past criminal convictions, etc. Moreover, the defendants' submissions establish that during the time when Netter was confined at the Jail, black males formed a substantial majority of the jail population which permits an inference that at least some of the time, it may be likely that some units would have entirely black populations.

Netter, in turn, has produced no evidence that he was assigned to all black housing units at all during the course of his stay and the Jail nor has he rebutted any of the aforementioned evidence relating to the factors utilized by the Defendants in making cell classifications. Similarly, he has presented absolutely no evidence to support his assertion that the Defendants had a policy or practice of racially separating prisoners as a matter of course. Finally, Netter has not shown that either Warden Larson or Sheriff Canarecci had any personal involvement in the alleged racially based housing assignments at the jail. The only individual responsible for the housing assignments is Sgt. Schroeder and, as noted above, Netter has produced no evidence that she engaged in any inappropriate race based segregation of prisoners. Thus, he cannot prevail on a claim against the Defendants in either their individual or official capacities, and the Defendants are entitled to summary judgment.

  **2. Failure to Protect**

Next, Netter contends that Warden Lawson and Sgt.. Schroeder were deliberately indifferent to his safety while he was housed at the Jail. This too, lacks support in the record.

Under the Eighth Amendment[2], "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citations and internal punctuation omitted). When an inmate is attacked by another inmate, the Eighth Amendment is violated only if "deliberate indifference by prison officials effectively condones the attack by allowing it to happen . . .." *Haley v. Gross*, 86 F.3d 630, 640 (7th Cir. 1996). Deliberate indifference is comparable to criminal recklessness, and is shown by "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). The defendant "must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A defendant must have "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). This total disregard for a prisoner's safety is the "functional equivalent of wanting harm to come to the prisoner." *McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991).

Negligence does not satisfy the "deliberate indifference" standard, *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994), and it is not enough to show that a prison guard merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). Deliberate indifference can be

---

[2] At the time of these incidents, Netter was a pre-trial detainee at the Jail. Claims of a state pre-trial detainee should be evaluated under the Due Process Clause of the Fourteenth Amendment instead of the Eighth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535-538 (1979). However, as a practical matter, the contours of the Due Process Clause in the prison context tend to be coextensive with the substantive constitutional principles applied via the Eighth Amendment to convicted inmates.

9

inferred only where defendants know there is a strong likelihood rather than a mere possibility that violence will occur. *Watts v. Laurent*, 774 F.2d 168, 172 (7th Cir. 1985). Prison officials cannot be expected to eliminate the possibility of all dangers. *McGill v. Duckworth*, 944 F.2d 344, 345 (7th Cir. 1991) ("Prisons are dangerous places"). Thus, the right to reasonable protection does not include the right to protection from random acts. *See*, *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991) ("some level of [danger] . . . is inevitable no matter what guards do").

Netter alleges that he was in need of protection because he became an informant in 2004 and his status as an informant was revealed by Sheriff Deputy Lucy Brown-McGee in 2005. He states that his current incarceration began on November 30, 2006. He asserts that the Defendants remembered his status since his prior release more than a year earlier on September 17, 2005 and thus, they were aware of his need for protection while housed at the Jail.

Although Netter makes these assertions, he lacks altogether any evidence that would suggest that Sgt. Schroeder or Warden Lawson knew of a specific need to protect him or that they sat idly by knowing that he was the target of other inmates. Netter has speculated that the fights he was involved in with other inmates were based upon his status as an informant but, even so, the evidence is uncontroverted that throughout his stay at the Jail the staff made every effort to avoid inmate interaction involving Netter. No where in the record is there any fact that could lead to an inference that the jail staff was deliberately indifferent to Netter's safety. To the contrary the record reflects a consistant effort to maintain order and safety within the confines of the Jail. There was no indication that Netter was going to be involved in a fight until the time it occurred on January 13, 2007.

Moreover, following the first fight the record is clear that Netter was immediately moved to

an area where there was no known conflict between Netter and any other inmate housed in that unit. After the second incident, Netter was then placed and retained in segregation. Nevertheless, on March 8, 2007, he signed a form asking to be released to general population because he did not like segregation. It is unclear if the risk he previously faced in general population had changed in any meaningful way at the time he signed this form. Assuming the risk had not changed, Netter has made no argument nor supplied any thoughtful discussion as to how Warden Lawson or Sgt Schroeder could be deliberately indifferent to a risk that Netter did not and does not consider serious enough to protect himself from by remaining in segregation. Accordingly, the court concludes that there is no genuine issue of material fact that Warden Lawson or Sgt. Schroeder failed to protect Netter while he was housed in the jail. Thus, summary judgment is appropriate on this claim as well.

## **CONCLUSION**

Based on the foregoing, the Defendants' Motion for Summary Judgment is GRANTED. The Clerk is hereby directed to enter judgment in favor of the Defendants.

Entered: This 9th day of September, 2008

s/ William C. Lee
United States District Court
